EDITH LENDBERG, ADMINISTRATRIX, v. THE BROTHERTON IRON MINING COMPANY.

*Negligence—Statements of party as to cause of injury—Trial—Burden of proof—Province of jury—Reading law reports—Charge of court.*

1. The statement of a party as to the cause of an injury resulting in his death, not made at the time of the accident, nor necessary or pertinent for medical treatment, is inadmissible as evidence.

2. A plaintiff has always the burden of showing his cause of action, and a defendant is entitled to go free unless made answerable by legal testimony. There are no presumptions against him, and, if there is no such testimony to be found, it is not admissible to make out a case without it.

3. Jurors cannot be allowed to intervene as interpreters of witnesses, and whatever goes to the jury must go to *all* through the same medium.

4. Whatever difficulties arise on a trial in getting testimony out of ignorant or stubborn witnesses can be best dealt with by leaving all parties to the usual methods.

5. It is no more correct for the court than for counsel to read law reports to the jury.

6. Precedents are for the use of courts, who are supposed competent to extract principles, and not for juries, who cannot be expected to discriminate in their use.

7. It is the office of a trial court to formulate the legal rules to guide the jury in the case before them with as little extraneous combination as possible.

8. The object of a charge is not to teach law to the jurors, but to direct their conduct in the controversy they are called on to decide.

Error to Gogebic. (Williams, J.) Argued April 9, 1889. Decided June 7, 1889.

Case. Defendant brings error. Reversed. The facts are stated in the opinion.

*M. M. Riley* and *F. F. Kutts* (*Hayden & Young,* of counsel), for appellant.

*Charles F. Button (Frank E. Robson,* of counsel); for plaintiff.

CAMPBELL, J.   This suit is brought to recover damages for the death of John Lendberg, who was employed in defendant's mine in Gogebic county, and who was accidentally killed February 22, 1887, under these circumstances:

Defendant had let a contract to certain parties to sink a shaft from a level some 50 feet from the surface, down to which another shaft already existed. The work was not carried on from the surface, but the new shaft was started at the level, and had been sunk 25 or 30 feet. A windlass was rigged on a platform across the opening on the level, and the rock was brought up in a bucket to this point, and removed along the drift. About six feet below the windlass a pump was set on timbers at one side of the shaft, with a plank for the pump man to stand on, reached by a short ladder from the level. The bucket was raised and lowered in the shaft so as not to come in contact with the pump-stand. Lendberg was employed by defendant, and it was his duty to go down and oil the pump, and see that it was in order, at the times when the miners changed work and went to their meals. Except at these times he was not required to go down, unless some occasion called for it; and the miners were expected to see to the pump while they were at work in the shaft.

The bucket for raising rock was attached by a hook to a rope, which was worked by the windlass, and was an inch and a half in diameter. It is claimed the defendant, which furnished this rigging for the use of the contractors, was liable for its having been allowed to get worn or cut by the hook, and the only negligence relied on was the condition of this rope. The theory of plaintiff—which is not very clearly set out in the declaration—was that this rope was kept in use when defendant had been made aware of its condition, and that while Lendberg was at the pump-stand, and a

bucket was being hoisted up to the windlass, the rope broke, and the bucket struck and broke the plank on which Lendberg stood, and he was thrown into the shaft, and fell on the bucket, and was so injured that he died.

It appeared that on the morning of February 22, 1887, about 8 o'clock, he was drawn up out of the shaft in the bucket, and was taken home, and died in twelve or thirteen hours. · Evidence was received against objection that sometime during the interval he told that the bucket fell by reason of the rope breaking, and broke the plank, and that he fell on top of the bucket. Except for this testimony there was no testimony except hearsay as to the cause or manner of his death. No eye-witness was sworn who saw the transaction. If it happened as charged, there were men at the windlass who must have known when the rope broke, and men in the shaft who loaded the bucket, and who would have been in peril from the fall of the bucket from overhead. These men were the contractors who had charge of all but the pump, and who could not have been unknown. Some of them were sworn, but none who were at the place when Lendberg was injured.

It is claimed by defendant that the manner and cause of his death do not in any responsible way appear, and that there was nothing from which the jury could properly have been allowed to find plaintiff's case made out. As this general failure of proof is relied upon as emphatically as the specific errors of less comprehensive bearing, a reference to the circumstances will be proper in the beginning.

The work being let by contract, the defendant had no control of the shaft-sinking beyond such oversight as would see that it was properly placed. This would cease as soon as the shaft had been fairly started; and the case shows that at the time of the accident the contractors had charge of all the mining operations, being furnished with the hoisting apparatus, which they ran themselves, and running the pump,

except as it required at intervals Lendberg's attention.   The bucket, when loaded, weighed not over 200 pounds, and the rope was an inch and a half in diameter, and had not been used long.   There were certain persons occupying subordinate positions in the mine, known as "shift bosses," who, under direction of the mining captain, visited various places in the mine to answer calls for what might be needed, and, in the case of miners employed on wages in the ordinary way, to see that their work was attended to.   In the case of contract work they did not interfere under ordinary circumstances.

A witness named Lake, who was one of the contractors, said that about 4 in the morning of February 22, 1887, Mr. Harris, who was the shift boss during that period of the day in this part of the mine, was at the place where Lake and his company were employed, and Lake showed him that the eye of the hook—which he says was of square iron—had worn in from a quarter to half an inch, and that there should be a different hook obtained.   According to his story, Harris recognized the fact, and said that the blacksmith should have one made.   In the meantime he told Lake to fix the rope himself, which all of the testimony shows could have been done by drawing the rope through further, so as to have a sound part in the eye of the hook.   All the witnesses examined on the subject show that it was the business of the persons using the bucket and tackle to attend to this themselves, and it was manifestly a very simple matter,—within any one's comprehension.

The court below rightly held that, if this accident arose from carelessness of these mining people, it was one of the risks which defendant could not be held liable for.

The testimony shows that blacksmith work was only done during daylight, and that a new hook could not have been made before Lendberg was injured.   As Lake understood perfectly the condition of the rope and hook, according to

his own story, the continued use of it in that condition was, if negligent at all, the negligence of himself and his associates. If he and they chose to use it as it was, instead of taking the small trouble of shifting the knot, which they should have done, and probably would have done if it was seriously thought there was any danger, they alone were to blame for it. What Harris suggested, as repeated by Lake, was a common-sense suggestion, which would have avoided all danger, and was for the contractors to attend to if they desired any safer method. It was denied by Harris, and he was somewhat corroborated, that any such interview took place. And it is also worthy of notice that Lake's testimony was so unintelligible in places as to call forth remarks from jurors, who seem to have understood Swedish as well as English, to the effect that his language was not correctly rendered.

If Lendberg was hurt as claimed, there was no negligence of defendant responsible for it. Harris, who is the only person claimed to represent defendant, and it is not necessary to consider how far he did so, gave proper directions in the matter, and the fault for not following them was with the contractors.

But the position is also well taken that there was no legal evidence which connected the injury with any defect in the rope. All there is to show it is found in the statement by hearsay of what Lendberg said about it at some time before he died. It was not a statement or exclamation at the time of the injury, and it was not necessary or pertinent for medical treatment. There is no authority for allowing such statements of a past transaction, by persons not witnesses, any weight as testimony. If Lendberg made any such statement, there is much in the facts to indicate that he could not have been in a position to be sure of anything more than the fact of his sudden fall. He was senseless for some time when brought up, and would not have been likely to know just what the difficulty was. But, however this may be, no

one else gave any such testimony. Lake and some others undertook to give the same version, but none of them were eye-witnesses. All that is sworn to by any eye-witness is that Lendberg was drawn up out of the shaft in the same bucket, and with the same rope. No one saw it broken, and no one saw it repaired. If the rope broke, and let the bucket fall on the pump-stand, as that was within six feet of the top, the rope must have broken close to the windlass. How it got down to the bottom of the shaft, and was so speedily tied that Lendberg was brought up almost, if not quite, immediately, is not explained. But no reason is given why the persons in charge of the windlass, and those who escaped death in the shaft when the rope broke, were not examined. The bucket must have been emptied before Lendberg could be put in it. The very short time stated by the witness to have elapsed during his absence seems very inadequate to account for all that must have taken place if plaintiff's theory is true. Beyond the fact sworn to that Lendberg was seen drawn up, and was probably thrown down in some way upon the bucket, there is nothing but mere conjecture. The cause and circumstances remain entirely unexplained.

A plaintiff has always the burden of showing his cause of action. Every defendant is entitled to go clear unless made answerable by legal testimony. There are no presumptions against him. If there is no testimony to be found, it is not admissible to make out a case without it. When plaintiff's case was closed, no cause of action had been made out, and the request that the court should so hold should have been granted. The testimony for the defense, if believed, showed there was no cause of action, and the short rebutting testimony did not remove the difficulty, and the court was again asked to hold that no case had been made out, and that a verdict should be rendered for the defendant.

It seems to us that there was no case for the jury, and the judgment cannot be sustained. Neither do we see any reason

why another trial should be gone into, since the defendant is
not at fault for the use of the rope and bucket if they were
improperly used at the time in question.   But the form of
granting a new trial seems appropriate.

There is much in the record which, as it stands, indicates
difficulties on the trial which could hardly have failed to do
mischief.   Intentionally, or quite as probably through ignor-
ance, witnesses evaded answering questions, and gave answers
not proper or called for.   The record does not show just when
and how interpreters intervened, but it does show that for
want of interpreting, and, once or twice at least, for want of
competent interpreting, some members of the jury got ideas
which were not open to the rest, unless they took them from
their fellows, which would not be allowable.   Jurors cannot
be allowed to intervene as interpreters of witnesses, and what-
ever goes to the jury must go to all through the same medium.
This same difficulty seems to have led the trial judge to inter-
vene with questions which interfered with the action of
counsel, and which, especially during cross-examination,
interfered with his rights.   The record does not disclose a
very orderly trial, and whatever difficulties arise in getting
testimony out of ignorant or stubborn witnesses can be best
dealt with by leaving all parties to the usual methods.

Complaint is made of the charge in various particulars,
but reference will not be made to all.   We think it was not
proper for the court to read to the jury the full report of the
case of *Swoboda v. Ward,* 40 Mich. 420.   It is no more cor-
rect for the court than for counsel to read law reports to a
jury.   There are in all reports discussions which may include
references to facts real or supposed, and law questions in or
out of the record, which cannot be taken literally and just as
they stand as guides to a jury in some other case, and with
different facts.   Between this case and that there are very
serious differences as to the alleged cause and manner of the
accident, and the supposed duty and negligence, that need

not be dwelt upon, because the citation would have been improper in the way resorted to in any case. Precedents are for the use of courts, who are supposed competent to extract their principles, and not for juries, who cannot be expected to discriminate in their use. It is the office of a trial court to formulate the legal rules to guide the jury in the case before them with as little extraneous combination as possible. The object of a charge is not to teach law to the jurors, but to direct their conduct in the controversy they are called on to decide.

There is also some force in the claim that the language of the court under the circumstances of the case had a tendency to prejudice defendant's witnesses, by dwelling repeatedly on the cases where one witness is contradicted by more than one, and yet is to be believed. Among other things, the jury were told:

"If five or six men should come on the stand and swear that the moon was made of green cheese, and one should swear that it wasn't, you wouldn't be compelled to believe it. If a dozen men should come on the stand and swear that the sun rose in the west, instead of the east, you wouldn't be called on to believe it."

So far as the record shows, the questions on which the witnesses differed were not matters out of the ordinary course of things, but ordinary matters of fact, and intrinsically no more impossible or improbable on the one side than on the other. At the same time the only such controversies in the record were between one witness for plaintiff and more witnesses for the defense. While there is no reason to doubt the entire fairness of the judge in his purposes, we cannot but see that there is danger in bringing in such warnings and comparisons as would have a not unnatural tendency to lead a jury to dangerous inferences.

We do not think it necessary to discuss other questions and rulings, inasmuch as the case is fatally defective as it stands, upon the grounds mentioned.

Judgment must be reversed, with costs, and a new trial granted.

SHERWOOD, C. J., and CHAMPLIN and MORSE, JJ., concurred. LONG, J., did not sit.