PEOPLE v. HOLMES.

1. HOMICIDE—DEGREE OF CRIME—QUESTIONS FOR JURY.
    Whether a homicide which the evidence tends to show was
    committed by the accused, who was a small man of nervous
    temperament, with a revolver which he procured from his
    room in his boarding house immediately after having been
    set upon and maltreated by the deceased, who was a fellow
    boarder and a man of large size and great strength, was
    prompted by a wicked and malignant heart, and, if so, whether
    there was such deliberation as to constitute the offense mur-
    der in the first degree, or whether it was committed in the
    heat of passion caused by reasonable provocation, and before
    due time had elapsed for reason to resume control, so as to re-
    duce the offense to manslaughter, are questions of fact for the
    jury.

2. SAME—PREMEDITATION—INSTRUCTIONS.
    An instruction, in such case, that the accused would be guilty
    of murder in the first degree, if he had time after the assault
    to form a conscious design of killing, is erroneous, in that it
    eliminates from the consideration of the jury the question
    whether the crime might not have been committed under the
    influence of passion for which there was a reasonable provo-
    cation, in which case, even though there was an intention to
    kill, the crime would be only manslaughter.

3. SAME—EVIDENCE—THREATS.
    Evidence of threats, though ostensibly made in jest by the
    accused to the deceased, is admissible upon the trial, and may
    be construed by the jury, in the light of subsequent events,
    as bearing upon the question of malice.

4. CRIMINAL LAW—TRIAL—INSTRUCTIONS.
    The rule that an instruction, though erroneous in itself, is
    cured by a correct statement of the law by the charge as a
    whole, will not be applied to a prosecution for murder, unless
    it clearly appears that such erroneous instruction could not
    have prejudiced the accused.

5. HOMICIDE—INSANITY AS DEFENSE.
    In a prosecution for murder, where the defense interposed
    is that the homicide was committed after an assault by the
    deceased upon the accused of so aggravated a nature as to

render the accused temporarily insane, the testimony offered in support of the defense should be treated with the same respect as that offered to establish any other fact, and the use of language in the charge to the jury which is well calculated to impress upon them the view that the defense of insanity is unworthy of consideration is reversible error.

6. TRIAL—READING LAW REPORTS TO JURY.
   It is error for the trial court to read to the jury an extract from an opinion rendered in the Supreme Court in a case differing in its facts from the case at issue; especially if the language quoted is argumentative.

7. WITNESSES—EXPERT TESTIMONY.
   Although a witness called as an expert on the subject of insanity may base his opinion upon his observation and experience in cases similar to the one at bar, he cannot, on his direct examination, be questioned concerning the particular cases.

8. SAME.
   While one expert may testify from knowledge as to the qualifications and authority of another expert, his opinion in regard thereto, based upon general reputation, is inadmissible.

Error to superior court of Grand Rapids; Burlingame, J. Submitted November 18, 1896. Decided December 24, 1896.

Joseph S. H. Holmes was convicted of murder in the first degree, and sentenced to imprisonment for life in the state prison at Jackson. Reversed.

*Thomas F. McGarry, George E. Nichols,* and *Jacob L. McPeek,* for appellant.

*Alfred Wolcott,* Prosecuting Attorney, and *Charles E. Ward,* Assistant Prosecuting Attorney, for the people.

MONTGOMERY, J. The respondent was convicted of murder in the first degree. A brief statement of the circumstances of the tragedy is as follows: Respondent and the deceased, Albert Johnson, were both boarders at the boarding house of Mrs. Posner, in the city of Grand Rapids. Both were about the age of 27 years at the time

of the tragedy. The deceased was a powerful man, weighing about 220 pounds, and respondent is rather frail and delicate, of a nervous temperament, and weighed, at the time of the tragedy, about 128 pounds. On the 12th of January, 1896, which was Sunday, Holmes sat in the sitting room of the boarding house, which was located in what could be termed the basement, the house being built upon ground which rises rapidly up from the street, the first story being level with the street, while the second story is more nearly on a level with the ground back a few feet from the street. Johnson came in from his work, entered the dining room from the outside door, and passed into the sitting room, where Holmes was reading. As he came in, he called out "Dinner!" and as he approached Holmes he said in a good-natured manner, "Hello, Birdie!" and Holmes replied in apparent good nature, "Hello, Fatty!" Johnson passed by Holmes, and in returning thrust his fingers, which were cold, down the back of Holmes' neck. Holmes was annoyed, and said "Stop!" or words to that effect, and, the fingers not being removed immediately, he jumped up from his chair, and struck Johnson with his fist somewhere about the chest,— a blow which probably inflicted no pain or injury. Johnson said, "Do you mean it?" Holmes replied, "Yes, I do." Johnson then said, "Wait until I get my coat off," whereupon he took off his overcoat, dropped it upon the floor, advanced a few steps towards Holmes, took him by the throat, backed him up against the wall of the house, and held him there for a few seconds at arm's length, Holmes meanwhile making no struggle or show of resistance. Johnson then released Holmes, and went to the kitchen, located on the same floor, the dining room being between the sitting room and kitchen. He was gone four or five minutes before returning to the sitting room.

Holmes, when released by Johnson, stepped to the little hallway out of which ascends a stairway leading to the next floor above. This hallway opens from the sitting

room, where this little scuffle had taken place, the door being some six or eight feet from where Holmes had been sitting reading. He advanced to the foot of the stairs after entering the hallway, placed one foot on the step, and stood there for a few seconds, then returned, and sat down in the chair he had been occupying before the scuffle. After he had seated himself, Johnson came into the sitting room again, and, without saying anything to any one, picked up his overcoat, made some inquiry about his boots from one of the boarders, and proceeded to the little hallway. This hallway has no light except that which comes either from the door being left open, or from a window situated some little distance from the head of the stairs. When Johnson entered the hallway, he left the door open. Holmes got up and shut the door, he says, "pretty quick." Others describe it by saying Holmes slammed the door shut. Johnson then opened the door, saying he wanted the door open in order to see. Holmes replied, "I am not going to get cold for you," and got up and slammed the door shut again. Johnson opened the door and said, "What do you mean?" Holmes said, "I mean that, if you weighed 300 pounds, you can't bluff me," and jumped up from his chair, where he had gone after shutting the door the last time, and went over to Johnson, who was then standing close by the doorway leading into the hall, and some five or six feet from Holmes. There is a conflict in the testimony as to whether Holmes struck Johnson first, or whether Johnson was the aggressor. Johnson clinched Holmes, and they both struggled around the sitting room, and they finally, in their struggles, passed through the door into the dining room. Johnson here got his left arm around Holmes' neck, and they both fell to the floor. They continued to struggle, and both regained their feet, Johnson still holding Holmes around the neck. While in this position Johnson struck Holmes in the face with his right hand three or four times, inflicting such injuries as caused Holmes' nose to bleed, his face being covered with blood.

At this point one of the boarders spoke to them, on which Johnson immediately released his hold, and they separated, Johnson going at once to the kitchen, and from there to the little wash room opening off from the kitchen, for the purpose of washing his hands. One witness testifies that Johnson, on releasing his hold, said, "I'll fix you."

Holmes, after this struggle, went back through the sitting room to the foot of the stairs which he had started to ascend after the first struggle, proceeded upstairs to his room at the head of the stairs, went to the dresser in his room, drew out the drawer, took from it his revolver, which was loaded, started back, removing the case from the revolver as he passed along, dropped the case on the floor, and as he passed back by the door of Johnson's room, which was on that floor, stopped and looked in at the open door, then passed down the stairway into the sitting room, out through the dining room, and into the kitchen, passing several people on his way, and, arriving at the kitchen, looked around that room, and passed across the room to within a few feet of the wash-room door, where Johnson was at that time engaged in washing his hands at the bowl in the northeast corner of the room, with his back towards Holmes. As Holmes entered the kitchen, Miss Helwig said to him: "I think you boys have gone far enough with this. Don't go near him. Your face is all blood now." Another of the boarders, who saw what Holmes was about to do, called out to him, "Here, Holmes." To these remarks Holmes paid no attention, except to glance at the speaker. In passing down the stairs and through the rooms, he put the revolver in his right-hand hip pocket, and he placed both hands in his hip pockets, and kept them in that position until he arrived in front of the wash-room door, as already stated. He then drew the revolver from his pocket, raised it, and fired three shots in quick succession. Johnson, as soon as the firing commenced, stepped off the little platform on which he was standing, and to the west, where he would be

partly behind the door casing and partly out of the range of Holmes' revolver. Holmes fired two more shots. One of these bullets passed into the fleshy parts of Johnson's left arm, and another pierced his left breast, and passed through his heart and killed him. He staggered into the dining room, and expired in a very few moments. Holmes immediately passed out of the kitchen, through the dining room, through the sitting room, up one flight of stairs, and out of the front door of the house, and went hurriedly to police headquarters, a few blocks away, presented himself at the window, and stated to witness Traxler that he had shot a man at 348 Ottawa street. Traxler, being surprised, said, "What!" and Holmes repeated the statement. He was asked if he had the gun, and replied that he had, and Traxler took it from him. It was suggested to him that perhaps he had not killed the man, and he said he thought he had hurt him.

On the trial the respondent offered testimony tending to show an hereditary predisposition to insanity, and tending to show that the treatment to which he was subjected brought on a temporary insanity, and that in all that he did after being subjected to the treatment which he received he acted automatically; and introduced the testimony of expert witnesses for the purpose of maintaining this defense. He was a witness himself upon the stand, and gave testimony tending to support this theory, testifying that while Johnson had his arm around his neck he could not breathe; that he felt a fullness in his head, and experienced a sensation of something giving way in his head; that he felt himself smothering; but could not recollect what took place subsequent to the sensation of fullness in his head.

1. It is insisted by the respondent's counsel that under the evidence in the case the court should have instructed the jury that the crime, if any, was not murder, but manslaughter; or, if murder, that it did not amount to murder in the first degree. It is true that under the law, as

111 MICH.—24.

it has been understood and administered in this State for many years, the act of killing, though intentional, may be committed under such circumstances as to make the killing manslaughter, rather than murder. This occurs when the act is committed in heat of blood, produced by an adequate or reasonable provocation, and before a reasonable time has elapsed for the blood to cool and for reason to resume its habitual control, and where the act is the result of temporary excitement, by which the control of reason was disturbed, rather than of any wickedness of heart, or cruelty or recklessness of disposition. In such case the law, out of indulgence to the frailty of human nature, regards the offense as of a less heinous character than murder, and designates it manslaughter. *People* v. *Scott*, 6 Mich. 295; *Maher* v. *People*, 10 Mich. 219 (81 Am. Dec. 781); *People* v. *Lilley*, 43 Mich. 526. But, in most cases, what constitutes such provocation is necessarily and obviously a question of fact. It must be such provocation as has a natural tendency to produce such a state of mind in ordinary men, and which the jury are satisfied did produce it in the case in hand; and, equally, in determining the length of time during which the passions aroused by provocation may be recognized in reducing the offense to manslaughter, the judgment of the average jury is more trustworthy than could be any precise rule laid down by the court. *Maher* v. *People*, *supra*. See, also, *People* v. *Garbutt*, 17 Mich. 9. The question must depend upon the nature of the accused and the laws of the human mind, as well as upon the nature and circumstances of the provocation. Whether the offense is murder or manslaughter depends upon the presence or absence of malice,—that is, whether the act is induced by adequate provocation, committed before reasonable cooling time has elapsed, and is the result of temporary excitement, by which the reason was disturbed, rather than of any wickedness of heart, or cruelty or recklessness of disposition; or whether, on the other hand, the act is

prompted by a wicked or malignant mind, which, in its habitual condition, when excited by no provocation which would be liable to give undue control to passion in ordinary men, is cruel, wanton, or malignant, reckless of human life, or regardless of a social duty.

Under our statute ( 2 How. Stat. § 9075 ), murder in the first degree is distinguished from murder in the second degree by this: In the former case there must be a willful, deliberate, and premeditated killing, or the offense must be committed in an attempt to commit a felony; while premeditation is not requisite to constitute murder in the second degree, if the other elements exist. Under the evidence in this case, we think it must be held that whether the shooting was induced by passion caused by reasonable provocation, or whether the act was prompted by a wicked and malignant heart, and also the question whether there was such deliberation and premeditation as to constitute the offense murder in the first degree, were questions for the jury. In *People* v. *Scott*, 6 Mich. 294, it was said:

" When, therefore, following the statute, we hold murder in the first degree to be that which is willful, deliberate, and premeditated, and all other murders to be murder in the second degree, we should be undertaking a task which, if possible, would be exceedingly dangerous to undertake, to enumerate what facts constitute deliberation and what exclude it. Practically, a jury could rarely find much difficulty in applying the test. Where there is positive proof of previous threats, ill will, or preparation, and all of such a nature as to lead naturally and clearly to a fatal crime, questions seldom arise. It is where surrounding circumstances are not clearly proven, and where the offense has no established antecedents, that difficulties have arisen in defining it. In all these cases the circumstances proven must be taken into account, and the jury must, from the whole facts, determine the intent and the deliberation. Voluntary manslaughter often involves a direct intent to kill, but the law reduces the grade of the offense, because, looking at the frailty of human nature, it considers great provocations sufficient to excite the passions beyond the control of reason. But

provocations often arise which are of less intensity, and are not in law regarded as sufficient to reduce the crime to manslaughter. If it appears that murder is committed upon a heat of passion engendered entirely by such provocations, and suddenly conceived, such a murder cannot properly be called deliberate. But whenever murder is intentionally committed, without serious provocation, and under circumstances which do not reasonably account for such an excitement of passion as naturally deprives men of deliberation, common experience teaches us that such an act is wanton, and its perpetrator responsible for it, as in other cases of cold-blooded crime. The time within which a wicked purpose is formed is immaterial, provided it is formed without disturbing excitement. The question of deliberation, when all the circumstances appear, is one of plain common sense; and an intelligent jury can seldom be at a loss to determine it."

In this case there was some testimony by Mrs. Posner tending to show threats previously made. It is true, this witness testifies that she understood the respondent meant these remarks in fun, from his action and appearance at the time; but the jury had the right to construe these statements in the light of subsequent events, independent of this testimony. Also it was the province of the jury to determine whether there had been time for the formation of a deliberate and predetermined design. The case is unlike that of *Hurd* v. *People*, 25 Mich. 405, as in that case the assault by the deceased had not been abandoned. In this case the parties had separated; respondent had gone upstairs, secured his revolver, and returned, and assumed the aggressive; and, while the jury might well have found that these acts were the result of one impulse, yet we are not, nor was the court below, authorized to say this as matter of law.

But while we fully realize that this question was, in this case, a question of fact, as did the trial judge, as shown by his general charge, we feel compelled to hold that he fell into a grave error in giving the people's fifth and seventh requests. The requests read as follows:

"*Fifth.* The question is, was such purpose formed before the deed was committed ? If so, even though such purpose was conceived but a moment before the deed was committed, the homicide is murder in the first degree; and if you find that the respondent purposely killed Johnson after reflection, with a wickedness and depravity of heart, and the killing was determined on even a moment before the fatal shot, he is guilty of murder in the first degree. "The deliberation mentioned in the statute refers to an intent to kill, executed by a person in furtherance of a formed design to accomplish an unlawful purpose. In order that homicide shall be murder in the first degree, the elements of premeditation and deliberation need to have coexisted but a moment before the killing, provided they have prompted the fatal act. The real test of malice is to be found in the presence or absence of adequate cause or provocation to account for the violence; and an unprovoked homicide, however suddenly conceived, may be malicious. In other words, malice aforethought does not mean, or need not necessarily mean, deliberate and calculating malice, but only malice existing at any time before the act, so as to be its moving cause or concomitant."

" *Seventh.* If, at the time the respondent shot Johnson, he thought of his purpose to kill deceased, and had time to think that he would execute it, and did so, and formed fully in his mind the conscious design of killing, and had time to think of the weapon he procured for that purpose, and that he would use it, he is guilty of murder in the first degree."

These instructions, particularly the seventh, instead of permitting the jury to decide whether there was such premeditation and deliberation as to raise the offense to murder in the first degree, gave it, as a rule of law, that if he had time to think he would kill deceased, and thought of his purpose to kill him, and formed in his mind the conscious design of killing, and had time to think of the weapon he procured for the purpose, and thought he would use it, this would constitute murder in the first degree. All these elements might exist, and the respondent be guilty of no greater offense than manslaughter. In answer to the criticisms of this charge the learned counsel for the people say in their brief:

"We think, when the charge is examined altogether, it will be seen that the instructions are not open to this criticism. They were given upon a specific branch of the case, namely, the time necessary to elapse for the blood to cool in order that the crime be murder, and not manslaughter. Every element in the case which it is claimed was left out of those requests, such as 'the condition of his mind, the assault, the provocation, and everything that would justify or excuse,' was given due prominence in the charge in such a way that the jury could not well have lost sight of them, nor have failed to understand that if he was insane he was not guilty at all; and the surrounding circumstances and the provocation were very carefully laid before the jury in such a way that they could not well have failed to understand that if he acted in the heat of blood, and before there was time for passion to subside and reason to resume its sway, and acted under such reasonable provocation as would lead an ordinary man of fair average disposition to act from passion rather than from judgment, then he could not be guilty of murder, but only of manslaughter."

We do not think it possible to say that the seventh instruction would be likely to be so interpreted by the jury. Fairly construed, this instruction could not fail to impress the jury with the view that, if the respondent was responsible for his acts *at all*, they were bound to find him guilty of murder in the first degree; for the facts embodied in the request can scarcely be said to have been in dispute. In a case of the supreme importance which this case has, we cannot hold an erroneous instruction to be cured by the general charge, unless it appears clearly that it could not have worked a prejudice with the jury; and, if we were to speculate as to this instruction, we should be led to quite the contrary opinion, as there was certainly ample room for a finding of the offense of manslaughter in this case, or of murder in the second degree.

2. In dealing with the subject of insanity as a defense, the trial court said:

"Our own Supreme Court, in discussing the subject of insanity, says: 'Unfortunately for the administration of

justice, persons are sometimes found who have succeeded in formulating theories under which, if properly applied, there would be hardly enough sane persons found to sit upon juries or attend to business. If the term ''insanity'' is to be enlarged so as to include persons who were capacitated to resist it, then it would include persons whom the law deems capable of crime, and is a phrase entirely inapplicable in civil or criminal law.' And in this case it is for you to determine whether the insanity relied upon by respondent's counsel is that convenient form of it which enables a person who does not choose to bridle his passions to allow them to get and keep the upper hand just long enough to enable him to commit an offense, and then let them subside.''

We think this instruction is open to the criticism made by respondent's counsel. It is argumentative, and well calculated to impress upon the jury the view that the defense of insanity offered was unworthy of consideration. The province of the court was to define what in law constitutes such a degree of insanity as excuses an act which, but for the fact of the clouded faculties, would constitute a crime. This the court did in other portions of his charge, but, in dealing with this question, fell into the error, as we think, of impressing his own views of the case, reinforced by argumentative language taken from a decision of this court in another case. When the question of insanity is to be submitted to the jury, the testimony which is offered to support the claim should be treated with the same respect as that offered to establish any other fact; and, if insanity is made out in the particular case, it cannot concern the jury that evil-disposed or ignorant persons are sometimes found who have formulated theories inconsistent with the true rule; and, as the jury naturally attend to the instructions of the court with a view to receiving aid in determining questions of fact it cannot be doubted that the use of this language was or at least might have been, interpreted as intended by the court to apply to the defense made in this suit, and to characterize the testimony of the medical witnesses for the defense. The fact that a portion of this language is

found in a judicial opinion does not of itself authorize it to be used before a jury. The rule of law determined by the court in the case quoted from was proper to be given to the jury, but the reasoning may contain language of impatience in treating of the subject, or of indignation towards a spurious defense, which would be exceedingly damaging when used in another case. The rule that the trial judge should not impress his own view of the facts upon the jury is so well understood that no authority need be cited to support it. As to the propriety of reading from the reports of other cases to the jury, see *Lendberg* v. *Mining Co.*, 75 Mich. 90, in which case the learned justice from whom the trial judge quoted in the instruction said:

"It is no more correct for the court than for counsel to read law reports to a jury. There are in all reports discussions which may include references to facts, real or supposed, and law questions in or out of the record, which cannot be taken literally, and just as they stand, as guides to a jury in some other case, and with different facts. Between this case and that there are very serious differences as to the alleged cause and manner of the accident, and the supposed duty and negligence, that need not be dwelt upon, because the citation would have been improper in the way resorted to in any case. Precedents are for the use of courts, who are supposed competent to extract their principles; and not for juries, who cannot be expected to discriminate in their use. It is the office of a trial court to formulate the legal rules to guide the jury in the case before them with as little extraneous combination as possible."

3. We think the objection to the testimony of Louisa Posner was properly overruled. The testimony was competent for the jury to consider. As before stated, the jury had the right to interpret this testimony in the light of subsequent events, and, if the threats were not made seriously, they would have no tendency to show malice; but if, in the light of what occurred on the fatal 12th of January, the jury believed these threats were made seriously, and really showed a purpose fixed in the respond-

ent's mind, the testimony certainly had a bearing on the subject of malice.

4. The respondent sought to show that one Dr. Edwards had received an injury bearing some analogy to the injury inflicted upon the respondent in this case by Johnson, and to show the effect upon his mind. This was excluded, and the ruling is assigned as error. The ruling was right. The rule is correctly stated in Rog. Exp. Test. § 35:

"While the opinion of experts may be based on their observation and experience in similar cases, yet the principle is well settled that such witnesses cannot, on their direct examination, be questioned concerning the particular cases which have happened to come within their observation, and which have no connection with the case in hand. The reason for the rule is manifestly to prevent the introduction of innumerable side issues, which might render the trial of a cause interminable, distract the attention of the jury from the real issue, and render the costs in the case unnecessarily burdensome and enormous."

See, also, 1 Greenl. Ev. § 448.

5. One Dr. Fuller was a witness in the case for respondent, and another medical witness, when on the stand, was asked whether he regarded Dr. Fuller as good authority. This testimony was excluded, and error is assigned on the ruling. As the question was framed, it calls for the opinion of the witness, which opinion might be based upon mere reputation, and we think the ruling excluding it was, for this reason, competent. It is true that one who has personal knowledge of the qualifications of an expert may speak to the fact, based upon such knowledge; but reputation cannot be shown, nor can an opinion as to the qualifications of an expert be based upon reputation. Lawson, Exp. Ev. 236; *Laros* v. *Com.*, 84 Pa. St. 200; *Thompson* v. *Ish*, 99 Mo. 160 (17 Am. St. Rep. 552). See, also, *Mason* v. *Phelps*, 48 Mich. 126.

None of the other questions raised are likely to arise on a new trial.

For the errors pointed out, the conviction will be set aside, and a new trial ordered.

The other Justices concurred.