PEOPLE *v.* BENNETT.

HOMICIDE—SELF-DEFENSE—INSTRUCTIONS.

> An instruction, in a prosecution for murder, from which the
> jury might get the impression that respondent's plea of self-
> defense was not sustained if they should believe that he was
> mistaken in his belief of danger, requires the reversal of a
> conviction, although the jury, in another portion of the
> charge, were correctly instructed that respondent might
> judge of the circumstances as they appeared to him, where the
> jury were evidently confused by the charge, and, upon return-
> ing into court for further instructions on the subject of justifi-
> cation, were instructed in the same language used in the
> original charge. GRANT, C. J., and HOOKER, J., dissenting.

Error to Ionia; Davis, J.    Submitted May 2, 1899.
Decided September 19, 1899.

Wesley Bennett was convicted of murder in the first
degree, and sentenced to imprisonment for life in the state
prison at Jackson.    Reversed.

*George E. Nichols*, for appellant.

*Horace M. Oren*, Attorney General, and *John B.
Chaddock*, prosecuting attorney, for the people.

MOORE, J.    The respondent killed Moses Walker on
the evening of July 10, 1897.    He was convicted of murder
in the first degree.    He admitted the killing, but claimed
he was acting in self-defense.    The record discloses Mr.
Walker was about 54 years old, and weighed from 160 to
180 pounds.    He was a farmer.    His niece, Mrs. Vivian,
a woman who had separated from her husband, was, with
her son, a small boy, living with him.    Mrs. Vivian was
a woman about 28 years old, and kept the house for Mr.
Walker.    The respondent was a man about 30 years old,
and weighed about 130 pounds.    He lived on a small farm,

and did his own housekeeping. In the spring of 1895 he made the acquaintance of Mrs. Vivian, and soon formed a warm attachment for her. He gave her a number of presents, and paid her marked attention. Mrs. Vivian testified he proposed marriage to her, but she gave him no satisfaction, and told him her uncle gave her a good home, and she did not care to leave him. Soon after the acquaintance of respondent and Mrs. Vivian began, it became evident Mr. Walker did not like it, and he forbade the respondent coming to his house. Mrs. Vivian, however, encouraged his attentions, and frequently met him at other places, and also met him at the highway in front of the house of Mr. Walker, and, with her boy, went driving with him. It was the theory of the people that respondent was madly in love with Mrs. Vivian, and that, when she assigned as a reason why she did not marry him that she had a good home with her uncle, he conceived the idea that, if he removed the uncle, the way would be made easier for his marriage with Mrs. Vivian, and, acting upon this thought, he procured a revolver, and without adequate provocation designedly killed Mr. Walker.

When the shooting occurred, the only persons present, besides Mr. Walker, were Mrs. Vivian and her little boy, who was too young to testify, and the respondent. It was the theory of the defense that the respondent and Mrs. Vivian were engaged to be married as soon as Mrs. Vivian procured a divorce for which she had applied, and for which Mr. Bennett was to pay; that Mr. Walker became very jealous of the respondent, and repeatedly threatened to kill him, and made repeated attacks upon him, and that Bennett acted in self-defense. The threats were shown by a number of witnesses. The respondent claimed that upon one occasion, when he called for Mrs. Vivian, Mr. Walker brandished a large club over his head, and threatened to kill him. Two other witnesses swore to seeing this done, though they were not near enough to hear what was said. The respondent testified that upon this occasion Mr. Walker took out a large knife, and threatened

him. He also said that, when visiting Mrs. Vivian, she and the boy and himself went to the orchard. Mrs. Vivian and the boy were sitting down, and, while the respondent was standing up, he heard the report of a gun, a bullet whistled near his head, and, looking in the direction of the report, he saw Mr. Walker. He testified that he believed that Mr. Walker then attempted to kill him, and that Mrs. Vivian expressed her belief that he intended to do so, and advised him that he had better prepare to defend himself; that, acting upon her suggestion, when he had occasion to be where Mr. Walker was likely to be, he put in his pocket, for the purpose of defending himself should he be attacked by Walker, a revolver he had owned for a long time. He also testified that shortly before the occurrence which resulted in Mr. Walker's death, while he was in the highway, with his buggy, waiting for Mrs. Vivian, without any provocation on the part of respondent, Mr. Walker threatened him, and ordered him to drive on, and, when he failed to do so, threw a brick at him. Upon the evening when Mr. Walker was killed, respondent called for Mrs. Vivian, in pursuance of an appointment made with her. He was driving a colt which he was breaking for his brother. Mrs. Vivian, her little boy, and Bennett went to Ionia, and spent some time there. When they returned, Mr. Walker was apparently waiting for them, and the following is Bennett's version of what occurred:

"It was about 10 o'clock when I arrived at Walker's place with Mrs. Vivian. When she got out, I handed the boy to her. She took him, and stood him down on the ground. At that Walker hollered at me, and says, 'Drive on there!' I says, 'I will drive on as quick as I get ready.' I reached under the buggy seat to get her berries that were under there, and handed them out to her, and spoke to my horse to go on. At that time Walker rushed out towards the big gate, and says, 'Go on now, G— d— you!' and throwed a brick over in the road that struck in front of my horse's feet. At that the colt began to back up. After he throwed the brick, he

started for the little gate on the run. He stopped there by the little gate, and stooped over, and picked up something off from the ground, and throwed it at my head. * * * It was moonlight enough so I could see it was either a stone or a brick. I dodged it. He came on the run for the buggy, and says, 'Go on, G— d— you, or I will kill you.' At that I drew my revolver, and throwed it down on him. Says I, 'Hold on there, you have gone far enough.' At that he says, 'Will you draw a revolver on me, you G— d— son of a b—?' and stooped over to pick something off from the ground, and I fired the first shot. He raised up, whirled around as though he was coming towards my buggy again, and I fired the second time. Then I fired right away. I didn't want to kill him. I was scared. I was afraid of him. I knew if he got hold of me he would kill me."

He testified in regard to the horse:

"He commenced to back up. I did not try to make the horse stand still. I spoke to the horse to go on. * * * Then he came out of the little gate, stopped at the little gate, and grabbed something up there, and threw it at me. It came near me. I ducked my head down, and it passed over me. The horse had come to a standstill by this time when he threw the second brick. Then he came on a run down the path to the buggy, coming down the plank.

" Q. Still you had the lines in your hands?

"A. No, sir; I dropped the lines when he ran for the little gate.

" Q. What for?

"A. Because I saw I was going to have trouble with him?

" Q. What did you drop the lines for?

"A. I could not get away. I saw he was going to get to the buggy before I could get my horse started. I could not start the horse because I did not have time. * * * I had no time to drive the horse on after he left the little gate and before he got to the buggy; no time to get out of his way at all."

Mrs. Vivian gave a different version of the transaction, and claimed her uncle threw but one missile.

A great many errors are assigned in relation to the action of the trial judge in admitting testimony, in rela-

tion █ his refusal to give the requests as prepared by couns█ for respondent, and to the charge as given. The charg█ was a very long one. In the main it was a clear and c█ect statement of the law applicable to the case. We th█k, however, the judge erred in some essential particula█ He was requested to charge the jury as follows:

"I█ his behalf I charge you that the respondent, when threat█d by immediate attack by Walker, was authorized to act, █d his actions are to be judged from the circumstances █s they appeared to him at the time; and the knowle█e or belief of the respondent that the person threate█ng him with an immediate personal attack was a man of █igh temper was a most important circumstance from wh█ch he was to estimate the probability and the character of █the attack, and what course of conduct he had reason t█ expect from his assailant, as well as the means by whic█ at the moment, he might deem necessary to guard himself █om the threatened danger. You have heard all of the t█stimony, and it is for you to judge who was the aggress█; and if you believe that Moses Walker was a person o█ quarrelsome disposition, or that he had made threats a█ainst Bennett, or that he entertained any vindictive feelings against Bennett, or had any motive for assaulting the accused, these facts may be considered by you, in connection with other testimony in the case, in determining who was the aggressor.

"I charge you, therefore, if the accused did not begin or invite the affray, but stood in fear of the deceased, and upon the defensive, and the deceased, in an angry and violent manner, attacked the accused, at the same time using violent, profane, and threatening language, and the accused, fearing an attack, took out his revolver, at the same time telling his assailant to keep away from him, but Walker did not heed the warning, but continued to advance towards the accused with the purpose of continuing the affray, and Bennett, acting upon the belief arising from the circumstances as they appeared to him, the strength of his assailant, the violence of the attack, the threats which had been made by Walker, his information or knowledge as to the violence of Walker's temper or his violence when in anger, or any other circumstance calculated to produce fear and apprehension of danger, and that he was in danger of his life or of great bodily harm, used the revolver, and shot the deceased, then the respondent must be acquitted."

He gave the request, but added:

"Provided he did what he could to avoid it, [and] get away from the danger threatened.

"Also I say to you, in this connection, gentlemen, that, before a person can avail himself of the defense of his life, you must be satisfied that that defense was necessary; that he did all he could to avoid it; that it was necessary to protect his own life, or protect himself from such serious bodily harm as would give him the apprehension that his life was in imminent danger. If he used the weapon, having no other means of resistance, and no means of escape, if he retreated as far as he could, he would be justified."

In another portion of the charge he said to the jury:

"If you believe, beyond a reasonable doubt, that Bennett could have escaped Walker's alleged vengeance at the time of the attack without killing him, the defense of justification has failed, and your duty would be to convict him of one of the degrees of the crime alleged. On the other hand, if, from all the evidence in the case, you believe his only resort for safety was to take the life of Walker, then he must be acquitted."

It will be readily seen that the jury might get an impression, from this statement of the law, that the respondent could not act upon his own belief of danger, and that he could not escape it in any other way than to do as he did do, if the jury believed, in the light of all the testimony, that he was mistaken, and could in fact have escaped. It is true that, in another portion of the charge, the jury were told the respondent might judge of the circumstances as they appeared to him; but the jury were evidently confused by the charge, for, after being out for a time, they announced they were not able to agree, and asked for further instruction in relation to the degrees of the crime, and as to what would be a justification for the shooting. The court proceeded to charge them, again using the same language he had used in the original charge. It has been repeatedly held in cases of murder that, where an erroneous instruction has been given, though in another portion of the charge the law has been

correctly stated, it will not cure the error unless it clearly appears the erroneous instruction could not have prejudiced the respondent. *People* v. *Holmes,* 111 Mich. 364. It is quite likely the jury, after the fact, would be warranted in saying, in view of all the testimony, that a cool-headed and courageous man would not have believed it necessary to do what was done by the respondent, upon the night in question, to save himself from bodily harm; but the law exists not only for the clear thinkers and the brave men, but for the weak and the timid, and they have a right to act upon an honest belief, though it be a mistaken one, if they act in good faith. In *People* v. *Lennon,* 71 Mich. 298 (15 Am. St. Rep. 259), the rule is stated as follows:

"I do not think it proper that a jury should be authorized to determine the standard of courage in a case of self-defense, or whether the party attacked, in what he did in his defense, acted cowardly, and therefore without warrant. There is no question of courage or cowardice in the case. I am aware that the rule laid down by the trial court has been sustained in some cases, collected and reported in Horrigan & Thompson's Cases of Self-Defense; but the doctrine, or the reason given for it, is not in accord with the principles of self-defense as now almost universally held and enunciated by the courts of this country. The question to be determined is, Did the accused, under all the circumstances of the assault as it appeared to him, honestly believe that he was in danger of his life, or great bodily harm, and that it was necessary to do what he did in order to save himself from such apparent threatened danger? If so, the inquiry is ended. It can and ought to make no difference whether he was a bold, strong man, used to affrays and personal encounters, or a weak, timid man, unacquainted with broils or assaults, as to the sufficiency of his reason for his action, if the jury believe that he acted honestly in fear of his life or great bodily harm. The fact of his physical and mental make-up and his experience in danger are to be considered, it is true, as bearing upon the honesty of his alleged belief, upon which he bases his right to act; but in such consideration the fact that the accused is weak, timid, and cowardly by nature is to be weighed in his favor, and not against him. To

hold otherwise would be to set at naught, and to rule at variance with, the well-known laws of human nature, and to place the weak and timid at the mercy of the strong. It is bad enough to be constitutionally a coward without having the law also declare that the coward has no right to act in self-defense until he reaches the point where a man of average courage would have defended himself in the same manner, and to have the *quantum* of courage necessary in such cases determined by a jury sitting in safety and cool blood, listening to what must always be a tame recital of the facts compared to their appearance at the time they occurred."

See, also, *Pond* v. *People*, 8 Mich. 150; *Hurd* v. *People*, 25 Mich. 405; *People* v. *Macard*, 73 Mich. 15; *Erwin* v. *State*, 29 Ohio St. 186 (23 Am. Rep. 733). The requests quoted of respondent should have been given.

As to the other errors assigned, they are either not well taken or are not likely to occur upon the new trial, and for that reason will not be discussed.

The judgment is reversed, and a new trial ordered.

MONTGOMERY and LONG, JJ., concurred with MOORE, J.

GRANT, C. J. I cannot concur in the conclusion reached by my Brother MOORE in this case. I think the respondent had a fair and impartial trial, that there is no reason for believing that the jury were misled by the charge of the court, and that the verdict is fully justified by the record. I think the fair and only inference to be drawn from this record is that the jury must have understood that the respondent was entitled to act upon the situation as it appeared to him. After the instructions given in my brother's opinion, and near the close of the charge, the court instructed the jury as follows:

"If you believe from the evidence that the respondent was assaulted by the deceased in such a manner as to induce in the respondent a reasonable and well-grounded belief that he was actually in danger of losing his life, or of suffering great bodily harm, and there was no way to escape except to shoot Walker, then he was justified in

defending himself, whether the danger was real or apparent. Actual or positive danger is not indispensable to justify self-defense. The law considers that persons threatened with danger are obliged to judge from appearances, and determine therefrom as to the actual state of things surrounding them; and in such cases, if persons act from honest conviction, induced by reasonable evidence, they will not be held .responsible criminally for any mistake as to the extent of the real danger. * * * In order for you to convict the respondent of murder in the first degree, you must find from all the evidence, beyond a reasonable doubt, a deliberate intention on the part of the respondent to take the life of Moses Walker. An unlawful killing with malice aforethought, willfully, with premeditation and deliberation, constitutes the crime of murder in the first degree; and the term 'deliberate' is not applicable to any act done on a sudden impulse. You cannot find the respondent guilty of murder in the first degree unless you find from all the evidence, beyond a reasonable doubt, that the respondent did, on the 10th day of July, 1897, kill Moses Walker, and such killing was with malice prepense or aforethought; and also find, beyond a reasonable doubt, that such killing was willful, deliberate, with a design to take the life of deceased. In order for you to convict the respondent of murder in the first degree, the specific intent, as well as all other elements of the offense, which I have mentioned, must be affirmatively proved by the people beyond a reasonable doubt; that said respondent did shoot and kill Moses Walker at the time and place specified, and that such killing was not excusable or justifiable, and that such killing was with malice prepense or aforethought. And if you fail to find, beyond a reasonable doubt, that such killing was perpetrated willfully, deliberately, and premeditately, you cannot find the respondent guilty of murder in the first degree. * * * If you should find that the assault by Walker upon the respondent was fierce, violent, and sudden, and apparently aimed to kill or do great bodily harm, and was not caused by anything that respondent had done at the time, the respondent was justified in repelling it, even to the taking of the life of Walker. It will be unnecessary to inquire what ill-feeling or malice was entertained by the respondent towards Walker, for, if a person is assaulted in a violent, fierce, and sudden manner, so that the only way left is for him to slay his

aggressor, if it so appears to him, then it is wholly immaterial what ill-will or malice he may have entertained towards him, if he contributed nothing to the attack, or in any manner caused it, for the malice and ill-will, if any existed, are wholly swallowed up in the defense of life itself."

As is usual in such cases, the charge of the court was somewhat lengthy, and it is not surprising that the jury returned into court, and asked for further instructions in regard to the degrees of murder.    After again instructing them upon this, in reply to a question by the court, the foreman said, "That covers the question;" whereupon another juror said, "We do not quite understand what the man's duty was, under the circumstances, to allow him to shoot a man to be justifiable; in other words, what would excuse him."    Thereupon the court repeated, in substance, his previous instructions upon this point, closing as follows:

"If you believe from the evidence that respondent was assaulted by the deceased in such a way as to induce in the respondent a reasonable and well-grounded belief that he was actually in danger of losing his life or suffering great bodily harm, and there was no way to escape except to shoot Walker, then he was justified in defending himself, whether the danger was real or apparent.    Actual or positive danger is not indispensable to justify self-defense. The law considers that men, when threatened with danger, are obliged to judge from appearances, and determine therefrom as to the actual state of things surrounding them; and in such cases, if persons act from honest convictions, induced by reasonable evidence, they will not be held responsible criminally for a mistake as to the extent of the danger."

The verdict of the jury could only have been reached by adopting the theory of the prosecution that the respondent had a motive in killing the deceased, that he premeditated the crime, and that the killing was willful and deliberate.    The verdict precludes the conclusion on the part of the jury that the killing occurred upon a sudden affray and in fear of danger to himself.    If the jury had found the respondent guilty of murder in the second de-

gree, there might possibly be some foundation for saying that they misunderstood the instructions; but the verdict shows that the jury placed no faith in the defense that respondent acted on a sudden impulse or in view of threatened danger.

I think the conviction should be affirmed.

Hooker, J., concurred with Grant, C. J.