## PEOPLE v. BOWEN.

1. HOMICIDE—EVIDENCE—INSANITY.-

In a prosecution for murder of respondent's wife, respondent, whose defense was that he committed the crime while temporarily insane and under the influence of suspicion that his wife was guilty of illicit relations with other men, testimony as to any facts within his knowledge, or conduct of which he knew, reports true or false, that were brought to him and that would tend to produce belief in her infidelity, unless otherwise privileged, was admissible..

2. SAME—EVIDENCE—CHARACTER OF DECEASED.

Evidence of his wife's guilt or innocence was not, however, admissible, since it would not have influenced his mind, and raised collateral issues.

3. EVIDENCE — PRIVILEGED COMMUNICATIONS — HUSBAND AND WIFE—MURDER—INSANITY.

Under 3 Comp. Laws, § 10213, the last conversation between respondent and his wife, held in, privacy, relating to their proposed final separation, was of a privileged character.

4. SAME— PRESUMPTIONS— PRIVILEGED COMMUNICATIONS— CONFIDENTIAL.

It is presumed that communications between husband and wife, no other person being present, are confidential until the contrary is shown.

5. SAME—DEATH—MARRIAGE.
   The privilege created by the statute survives separation, divorce, or death.

6. SAME—CORRESPONDENCE—LETTERS.
   It also extends to letters written by the wife to the husband, and to letters from other persons shown or given by her to him.

7. SAME.
   The husband could testify to the contents of letters from others to his wife, received and read by him, provided that it was not through her permission, and that the proper foundation for secondary evidence was laid.

8. SAME.
   Conversations at which third persons were present were competent.

9. TRIAL—CRIMINAL LAW—HOMICIDE—EVIDENCE.
   It was improper conduct on the part of respondent's counsel to persist in asking leading questions upon a subject that had been excluded from the consideration of the jury, in a trial for murder; and any necessary offers of testimony should have been made in writing without bringing them before the jury.

10. HOMICIDE—MANSLAUGHTER.
    Although respondent did not claim that he killed his wife in sudden anger, but defended on the theory that he was seized by emotional insanity, it was of doubtful propriety to instruct the jury that they must find defendant guilty of murder or acquit him, thus excluding a verdict of manslaughter.

11. EVIDENCE—HYPOTHETICAL QUESTIONS.
    A hypothetical question based on facts not shown by the evidence was properly excluded.

12. SAME—OPINION EVIDENCE.
    Questions asked of a medical expert, on the basis of his understanding of testimony given by another expert, was properly excluded.

Error to Newaygo; Palmer, J. Submitted January 20, 1911. (Docket No. 175.) Decided March 31, 1911.

Clyde Bowen was convicted of murder in the second degree. Reversed.

*Dunham & Phelps,* for appellant.

*John G. Anderson,* Prosecuting Attorney, for the people.

Hooker, J. The respondent and his wife were young married people. There was testimony tending to show that they were living apart; she doing laundry or housework for hire, and he working at other places. It is inferable from the testimony that he was, and perhaps had cause to be, jealous and suspicious of her relations with at least two other men. A while before the homicide, Vera, his wife, came to the residence of Ezra Brower, whose wife was her relative, and later she went to her mother's home. Respondent went there to visit her on or shortly before October 30th, and on the 31st, the day of her death, they went to church together. On the way home from church they sat down to rest or converse, and during the conversation he cut her throat, and she died immediately. He dragged her back from the road, and went to his mother's house and told what he had done, after making a futile and perhaps feeble effort to cut his own throat. He made repeated admissions and at first pleaded guilty, but later secured counsel and made a defense; it being claimed that he was mentally irresponsible at the moment that he committed the act. "Emotional insanity" is the name that is applied to this particular kind of alleged irresponsibility in the briefs of counsel. The defendant was convicted of murder in the second degree, and was sentenced. The cause is here on writ of error and bill of exceptions.

The assignments of error are numerous, but have been conveniently grouped by counsel for the defendant. Upon the trial the defense sought to show defendant's jealousy, and that his wife's conduct was such as to cause it, and that from her conduct in his presence, and things she did in his absence, reports of which were brought to him, a condition of mind resulted which made his act that of an irresponsible person. While there was testimony tend-

ing to show that he was much worried, and very unhappy for some time prior to the homicide, we recall no evidence nor any claim that he was irresponsible, except the alleged momentary unaccountableness, while he was engaged in cutting his wife's throat, of which he denies all knowledge until he saw the blood.

The learned circuit judge seems to have thought that such a condition as the defense claimed existed at that moment was not dependent on the actual conduct of defendant's wife, but upon what he understood and believed it to be. Accordingly he held that proof tending to show misconduct on her part was not admissible, although he permitted proof of reports of misconduct and testimony from third parties to what occurred at interviews between the defendant and his wife, but did not allow defendant to testify concerning them. Again, he seems to have thought that under the circumstances of the case there was nothing justifying the submission of the question of manslaughter to the jury, and instructed them that he could not be found guilty of that, but must be found guilty of one of the degrees of murder, or not guilty.

The defendant was a witness in his own behalf, and counsel sought, but was not permitted, to show by him conversations, that for convenience may be divided into four classes:

(1) Private conversations which occurred between defendant and his wife when alone before the day of the killing.

(2) Similar conversations in the presence of others.

(3) The conversation during their walk and leading up to the homicide.

(4) Testimony as to the contents of certain letters written to or by his wife.

We are of the opinion that it was not competent to show facts indicating the infidelity of the wife where such facts were not shown to have come within the personal observation of the defendant. It must be borne in mind that the defense sought to show that for the moment, by rea-

son of disease or insanity, defendant's mind was in a condition which made him incapable of understanding the nature of his act, or of having the power to control his acts, or, as expressed in the case of *People* v. *Durfee*, 62 Mich. 493 (29 N. W. 111):

"Perhaps it would be enough to say—and to leave it right there—that if, by reason of disease, the defendant was not capable of knowing he was doing wrong in the particular act, or if he had not the power to resist the impulse to do the act by reason of disease or insanity, that would be an unsound mind. But it must be an unsoundness which affected the act in question, and not one which did not affect it."

And:

"This unsoundness must be the result of a disease, and not the result of his having allowed his passions to run until they have become uncontrollable. We frequently meet men in courts of justice who claim that they have committed a crime because they were drunk. The law holds them responsible, because they should not have got drunk; they should not have formed the habit. So the law requires of a man that he will curb his passions and restrain himself, and if he does not do it, holds him accountable, unless it is by reason of disease, which renders him unable to do it."

The condition of defendant's mind could only be affected by his knowledge or belief. Hence any facts within his own knowledge, or any conduct that he must have personally known, and any reports, true or false, that were brought to him, which would tend to produce in his mind suspicion or belief in her infidelity, were competent, and unless privileged were admissible. These would not be strengthened or weakened by substantial proof of the fact of incontinence or innocence, or of the truth or falsity of the reports brought to him. These were collateral questions and tended to raise collateral issues foreign to the real inquiry, *i. e.*, What was defendant's condition of mind on the occasion of and preceding the homicide? In the recent case of *People* v. *Sharp*, 163 Mich. 79 (127 N.

W. 758), defendant was on trial for shooting the alleged paramour of his wife. The prosecution on rebuttal introduced testimony tending to show that incontinence was a fault of the wife that existed before her relations with the man who was shot, for the purpose of meeting the defense of emotional insanity. We held that this was inadmissible; the real question being whether her husband had known or heard of any such relation or rumor, and the action of the trial judge in striking out the testimony was approved.

The statute, 3 Comp. Laws, § 10213, provides that neither (husband or wife) "shall either during the marriage or afterwards without the consent of both, be examined as to any communication made by one to the other during the marriage," etc.

The defendant was called as a witness on his own behalf, and his counsel questioned him in relation to the conversation that occurred between himself and wife on the occasion of and immediately preceding the homicide, as well as on other occasions when they were alone. He sought to prove admissions or communications expressly conferring or implying her incontinence. The court held that such testimony was inadmissible under the statute mentioned. Counsel for defendant say that there was no reason to believe that the communications between them on these occasions were confidential. It is sufficient to say upon this subject that the presumption should be that the intention was that any communication between husband and wife, no other being present, should be considered confidential until the contrary appears. 4 Wigmore on Evidence, § 2336, and cases cited. These parties sought solitude. According to the claim of the defense, they were having a last talk before a final separation, and doubtless they were discussing a matter of extreme delicacy and vital importance, closely related to their marital relation, and in our opinion the most liberal construction of the statute would not justify a suspicion even that the communications were not intended to be in marital confi-

dence. 23 Am. & Eng. Enc. Law (2d Ed.), p. 99. They were then privileged, and under the explicit words of the statute the husband could not testify to them without the consent of his wife, which, being dead, she could not give. The privilege secured by this statute survives separation, divorce, and death. 4 Wigmore on Evidence, § 2341; 23 Am. & Eng. Enc. Law (2d Ed.), p. 98.

That the privilege extends to evidence in criminal cases generally admits of no doubt. 23 Am. & Eng. Enc. Law (2d Ed.), p. 95; *People* v. *Warner*, 117 Cal. 637 (49 Pac. 841); *People* v. *Murphy*, 101 N. Y. 126 (4 N. E. 326, 54 Am. Rep. 661); *People* v. *Wood*, 126 N. Y. 249, 271 (27 N. E. 362). In our opinion it was not competent for defendant to testify to the conversation that preceded his homicidal act, or to any other communication between himself and wife regarding the subject, when no other person was present.

We have said that the court did not err in refusing to allow the defendant to testify to communications between himself and wife in private, and for the same reason it was not error to refuse to permit him to testify to the contents of letters sent by her to him, or given or shown to him by her, whether written by her or others. He had the right to testify to the contents of letters from others addressed to her, but received and read by him (provided it was not through her permission, if there were such) which tended to support the defense made, provided a proper foundation for secondary evidence was laid, of which last condition we have been unable to satisfy ourselves.

Again, conversations between husband and wife and third parties sought to be shown in this case were not privileged; such were the incidents of the postal cards, and her intention to go to San Francisco, to indorse and collect certain of his checks in her possession. There is no doubt of the propriety of admitting the testimony of third parties and of the respondent as to these conversations. See 23 Am. & Eng. Enc. Law (2d Ed.), p. 96, and cases cited. The

incidents were as follows: Gertrude Bowen and defendant and Vera were together. Vera showed Gertrude a postal card. She asked who it was from. Counsel claims that it was from a man and offered to show that she answered:

" ' Clyde knows. Look at the look on his face;' and that when she looked at the face of respondent, her brother, he was pale, and turned around and walked away, and was biting his lips."

Defendant was not permitted to testify to this interview or its effect upon him. Again, defendant's mother testified to a conversation in her presence, when Vera told defendant that she was going to San Francisco. This was admitted in part, but some of it was excluded. We are of the opinion that these conversations should not have been excluded.

We are impressed with the care taken by the learned circuit judge in trying this case, and his fairness in the face of persistent efforts to get before the jury a class of communications which he had held to be privileged and inadmissible. Notwithstanding such ruling and notwithstanding the fact that there could not be and was not any claim that the questions put upon the record were not fairly within it, counsel persisted in the presence of the jury in putting to the defendant innumerable leading questions which, taken collectively, got before them their claim as to the entire details of the interview at the time of the tragedy. The effect of this might have been an acquittal and a possible irreparable injustice to the public. Counsel should not have attempted this, and the court should have taken whatever steps were necessary to prevent it. Counsel's offers to prove in such a case, if necessary, could have been made in writing without allowing the jury to hear it, which would have sufficiently preserved the defendant's rights. The fact that the people have no right to appeal makes it incumbent upon the circuit judge to protect them against influences of this kind.

There is another subject that from its prominence demands attention. It was not claimed on the trial, and is

not here, that the defendant acted from sudden and uncontrollable anger, induced by a cause, which might reduce the killing from murder to manslaughter, and the court instructed the jury that they must find defendant guilty of murder, or not guilty. We think that this charge was of doubtful propriety, and, without at this time holding it to be error, commend the question to careful attention upon another trial. In this connection, see *People* v. *Repke*, 103 Mich. 459 (61 N. W. 861); *People* v. *Holmes*, 111 Mich. 364 (69 N. W. 501); *People* v. *Nunn*, 120 Mich. 534 (79 N. W. 800); *People* v. *Warren*, 122 Mich. 504 (81 N. W. 360, 80 Am. St. Rep. 582); *People* v. *Remus*, 135 Mich. 629 (98 N. W. 397, 100 N. W. 403); *People* v. *North*, 153 Mich. 612 (117 N. W. 63); *People* v. *Doyle*, 160 Mich. 423 (125 N. W. 358). See, also, *People* v. *Brott*, 163 Mich. 150 (128 N. W. 236).

Dr. Whitehead, a physician, was called as a witness for defendant; testified that he had examined him two or three days before he was sworn, and that the lobes of his brain might be affected by a disease that he testified that he had, and that, if so, it would have a tendency to cause what is called irascible mania and crime. In his opinion irascible mania and emotional insanity are practically interchangeable terms. He said that he must have been suffering from those lobes of his brain at the date of the homicide and, in his judgment, subject to what is known as impulsive insanity. Thereupon counsel for defendant asked this physician a hypothetical question covering more than eight pages, and in which there was an apparent attempt to set up as facts to be assumed the testimony as defendant's counsel understood it, and concluding as follows:

"Now, doctor, assuming all these things to be facts, I ask you whether or not Clyde Bowen at the very moment of taking the life of his wife that Sunday afternoon, October 31, 1909, in your opinion was suffering with emotional insanity to such an extent as to be unable to judge between the right and wrong of the act?"

It was objected to as not warranted by the testimony. We think the answer was properly excluded. *People* v. *Brown*, 53 Mich. 531 (19 N. W. 172). Dr. Nelson was then called. He had testified to defendant's diseased condition. Several questions were asked him, based in part on his understanding of what Whitehead had testified, and those were properly excluded. *People* v. *Aikin*, 66 Mich. 460 (33 N. W. 821, 11 Am. St. Rep. 512).

The conviction is reversed and a new trial ordered.

OSTRANDER, C. J., and BIRD, MOORE, and McALVAY, JJ., concurred.