The defendant was tried on a bill of indictment charging her with the murder of Lila Simpson Lawson, and was convicted of murder in the second degree. The evidence pertinent to an understanding of the appeal and of this decision may be summarized as follows:
The evidence of the State tended to show that the deceased, Mrs. Lawson, lived alone in an upstairs apartment, consisting of a living room, bedroom, and kitchenette, in the town of Kinston, to which access was made by an outside stairway. The defendant had been in her employment as maid for about two years. Mrs. Lawson was engaged in the business of making and furnishing sandwiches of various kinds to filling stations and stands where they were retailed, and defendant assisted her in this business.
During the latter part of May, 1942, Floyd Daughety, one of the State's witnesses, then visiting in Kinston and about to leave, decided *Page 243 
that he would call on Mrs. Lawson. He arrived near 10:00 o'clock, went up the stairway and found the door closed. He opened the door and called her and, receiving no answer, walked in and went straight back to the bedroom, looking into the kitchen as he passed, and then saw Mrs. Lawson's head. He found Mrs. Lawson lying down with "one hand kind of up," felt her arm, and found it was cold. Just at that time the telephone rang, and witness answering, found Fred Bates on the line and told him what he had found and asked him to come up, and then called Sheriff Churchill.
In the bedroom there was a rug thrown on the bed and the cover was "kind of pulled off the bed and a pillow was on the floor kind of under the bed and the other one was scattered around on the bed." Witness saw a "bunch of stuff looked like it had been dumped out of a pocketbook on the dresser." The dress deceased had worn the night before was "hanging on a coat hanger on the door that opened into the living room, and a pair of shoes were sitting under the bed right next to the head of the bed." There was only one sheet on the bed, and the other was under Mrs. Lawson's feet and tied around her feet. The cover on the bed looked like it had been wadded up; and the remaining sheet on the bed looked as if something had been dragged across it. One corner of the sheet tied around Mrs. Lawson's feet was wet.
This witness did not attempt to move the kitchen door before the others arrived. "It was open just wide enough for me to get my hand in there and feel her arm." "Mrs. Lawson had on just a nightgown. That was arranged on her body just like most anybody that would be lying down; it was on her all right. It was pulled down on her body. The sheet was wrapped around her legs and tied and the rest was around her or under her; there was a knot tied in the sheet just above her ankles kinder, just one tie."
Other witnesses described the position and condition of the body and of the several rooms in about the same way. It was stated by others, however, that the sheet was loosely tied, somewhat above the ankles, the corners twisted and drawn together, but not firmly knotted, so that a movement of the legs might have loosened the sheet. It was also stated that one corner of the sheet was wet, slick and slimy.
Several witnesses testified that portions of the body had a cherry red color. The evidence of the State further tended to show that the odor of gas was present and could be detected as one approached the apartment from the platform, and that it was present in the kitchen where Mrs. Lawson was lying; that a jet on the gas stove was open about one-third to one-half, and that the odor of gas was present in the room when the witnesses arrived. *Page 244 
The defendant was arrested on the same day the body was found, and there was found in her possession, under the mattress in a room where she resided, Mrs. Lawson's pocketbook. The defendant was questioned with regard to her movements and the death of Mrs. Lawson without material result, but she was transferred to a jail in an adjoining county. There she made a confession, which was introduced in the evidence. It was to the effect that she had gone to the apartment that morning, where she was employed as maid and cook, and found Mrs. Lawson drunk; "she began arguing and cursing me and we got into a scuffle; Mrs. Lawson fell on the floor in the kitchen, and I took a sheet and wound around the feet of Mrs. Lawson and I turned on the gas and then I took her pocketbook and her money and went home. I met Tink Davis when I left home and he asked me about borrowing some money. I gave him the money I got from Mrs. Lawson's pocketbook and asked him to keep it for me."
Oral testimony as to her confession added the particular that defendant had taken $39 from the pocketbook.
This confession the defendant later repudiated, stating that it had been obtained from her by threats, intimidation and abuse. She stated on her testimony that she went to the apartment of Mrs. Lawson in the morning; found her pocketbook upon the balcony; that the door was locked and she was unable to enter, and she, therefore, took the pocketbook to her home; that she had frequently taken care of Mrs. Lawson's pocketbook and that she took it now for that purpose. She stated that she frequently handled money for Mrs. Lawson when she would be going off Saturday nights and didn't want to take her money; that frequently Mrs. Lawson would give her the pocketbook for safekeeping when she got drunk.
After the indictment of the defendant, the body of Mrs. Lawson was disinterred by order of court and sent to Duke Hospital, where an autopsy was performed by Dr. Forbus, assisted by Dr. Taylor and others.
Dr. Forbus testified as to this autopsy and the conditions found as follows:
"I have had experience as a pathologist. My principal occupation is performing autopsies on bodies for the purpose of ascertaining the cause of death; I have been engaged in that occupation since 1923. I was engaged from 1923 to 1928, in Baltimore; from 1928 to 1930, in Europe, and from 1930 until now, in North Carolina. That is my principal occupation. I have either performed myself or have had performed under my direction studies of this sort approximately 8,000 cases.
"I was requested to make an autopsy of the body of Mrs. Lila Lawson of Kinston. The body was delivered to me by the undertaking establishment in Kinston, Mr. Jarman representing said undertaking establishment. *Page 245 
The body was at that time in the casket. I did perform the autopsy on the body of Mrs. Lawson. The examination I made consisted of an examination of all of the body as a whole and of all the tissues, that is organs of the internal parts of the body. That examination is made both by observation with the naked eye and also by observation with the microscope.
"I prepared a report of what I did and what I found in the performance of this autopsy. I performed this examination as I have described. I found three things; the first was a peculiar color of the body, both internally and externally, which I shall describe as cherry red color. I found a bruise on the upper right arm. I found a bruise on the right thigh. I found no other changes. I made a complete autopsy of the body. A complete autopsy consists of the examination of the external parts of the body and an examination of all of the internal parts of the body. The method that was used consists of using or utilizing one's gross powers of observation or examination with your eyes, and the other method is the study of the organs of the body by means of the microscope. I made a written report of my findings, and I have a copy of the original report with me. I have already explained that I found three things, the color of the body to be abnormal as I have described it as a cherry red; I also found the two bruises that I mentioned. The two bruises were of no consequence; that they were quite near the surface of the skin and I did not regard them as of any importance.
"The cherry red color that I found, that is characteristic of a person when that person is poisoned by a gas, which is called carbon monoxide. I found nothing other than that carbon monoxide and the two bruises and the color, that could have any bearing on the death of this person. This particular color is a direct indication of a chemical substance that is formed when carbon monoxide is taken into the blood. That is the condition that we call medically carbon monoxide poisoning.
"After having performed this autopsy as I have described, I further tested my own findings by calling into consultation a chemist, Dr. Haywood Taylor. I submitted to Dr. Taylor certain specimens for his examination for the purpose of determining critically the presence of carbon monoxide. I was assisted by Dr. Taylor and a group of other assistants. Dr. Wooten was present. I conducted the autopsy.
"Q. Dr. Forbus, assuming that the jury should find from the evidence and beyond a reasonable doubt that Mrs. Lila Lawson was found dead in her kitchen in her home at about the hour of 10 o'clock a.m., on May 31, 1942, and that her body was taken to an undertaking establishment in the city of Kinston and there treated for burial and embalmed and buried on June 1, 1942, and that subsequent thereto, to wit: on June 30, 1942, her body was removed and carried to Durham, whereupon a post-mortem *Page 246 
examination was made by you; and assuming further that the jury should find that there was gas in the room, in the kitchen where the deceased was found at the time of her death; that one of the jets on the gas stove in her kitchen was about half-open and that the odor of gas could be detected when entering the house and that at the time the body was discovered at around 10 o'clock a.m., on May 31, 1942, it had the appearance of a cherry red color, and from your autopsy and postmortem examination do you have an opinion satisfactory to yourself as to the cause of the death of Mrs. Lila Lawson?"
Defendant objects — overruled — defendant excepts.
EXCEPTION No. 1.
"A. Yes, sir, I have an opinion.
"Q. What is your opinion?"
Defendant objects — overruled — defendant excepts.
EXCEPTION No. 2.
"A. It is my opinion that Mrs. Lila Lawson died of carbon monoxide poisoning."
Defendant moves to strike — motion denied — defendant excepts.
EXCEPTION No. 3.
"One dying of carbon monoxide poisoning would have to breathe it into their lungs in order to absorb it. I made a written report of the autopsy I performed. This is a copy of my report. (Counsel shows witness paper.) This is the original report made by me. (Shows witness another paper writing.)
(State offers said report in evidence as STATE'S EXHIBIT 4.)
"BY THE COURT: For what purpose is this offered?
"COUNSEL: To show the extent of the examination.
"The body of Mrs. Lawson was brought to me on June 30, 1942, and on that day I performed a complete post-mortem examination; that examination included an examination of the entire body of Mrs. Lawson and of all the internal organs. That examination also included a description of the organs of Mrs. Lawson as they were seen under the microscope. Following that examination I submitted to Dr. Haywood Taylor specimens of tissues, specimens of organs for a chemical examination for the presence of carbon monoxide.
"At the end of that examination, I summarized my findings, and after discussing in writing the case I expressed an opinion as to the cause of death. I made what I consider as a complete autopsy to determine the cause of the death of Mrs. Lawson, I now have an opinion as to the cause of her death. The body has a characteristic cherry red color; that color is also visible in all the internal organs of the body. I found the organs of this body to show this characteristic cherry red color. *Page 247 
"Q. State whether or not from your examination you found any other cause of death other than carbon monoxide, as testified by you?"
Defendant objects — overruled — defendant excepts.
EXCEPTION No. 4.
"A. I found no other cause for death than carbon monoxide poisoning.
"The time within which rigor mortis will set in after a person dies of gas poisoning varies somewhat. Rigor mortis ordinarily sets in within a period of one to two hours following death. In case of death without gas it would not be materially altered."
CROSS-EXAMINATION
"It is possible that there are other conditions that would produce a cherry red appearance of the skin and tissues; one could paint the skin, for example, and produce a cherry red color; artificial cosmetics might produce such color. Doubtless there are other things but I don't recall anything that would produce this particular color. The excessive use of alcohol would not do it. That does not alter the color of the skin. There is no difference in the appearance of the skin after death of a person who indulges in the excessive use of alcohol; of course, there would be a marked pallor. The use of embalming fluid has effect on the color of the skin, depending entirely on the character of the embalming fluid used. This body had been embalmed when I had it, and had been dead exactly thirty days, according to my record.
"Q. The color of the skin nor the color of the tissues are a conclusive indication of presence of carbon monoxide poisoning?
"A. Under certain circumstances.
"Q. Are they always?
"A. Not always.
"My findings are obviously influenced by what I was told about the history of the case. My findings in this case are influenced only in an immaterial way by what I was told about the case. In the hypothetical question which I was asked, the only reference to gas was because that gas was present in the room. It is entirely possible for a person to be present in a room in which there was gas and still not die from the effects of gas. It is entirely possible for a person to have the presence of carbon monoxide both in the blood and in the tissues and still not die as a result of it. Unless you have some recognized blood test to determine the saturation one is guided entirely by the intensity of and I was guided that way in this case. Within limits I can be governed by the color. What I am doing is simply giving an opinion. I think I do know what produced her death. I could, to be sure, make a mistake.
"Q. You say in your report: `The color, I think is distinctive in the lung and in the spleen, but its intensity is not so marked in the kidney *Page 248 
and the quality is not so sharply defined as to make it possible for one to attribute it specifically to carbon monoxide'?
"A. That is correct, and that is what I say now. I refer you back to the statement regarding the lungs.
"My conclusions in respect to the death of Mrs. Lawson are not the result of the process of pathological elimination. I did not say that in my report.
"Q. You wrote: `There seems to be little doubt about this' — No, let me find it — you wrote on the last page indicating an elimination of causes: `In the absence of any other possible cause of death and in view of the known lethal effects of carbon monoxide, the finding of the poison in the tissues, together with the finding of tissue discolorations that are typical of poisoning by this substance leave no doubt that death was caused by the inhalation of a carbon monoxide containing gas'?
"A. Yes, sir.
"Q. Then you were following the process of elimination?
"A. May I refer you to the last sentence on the page which begins with the `Summary of important findings' — I would like to refer you to a part of that report which you have not read. The last sentence of that paragraph reads: `Although it is not possible to determine quantitatively the exact concentration of carbon monoxide in the tissues, the intensity of the typical discoloration indicates clearly that the poison was present in the tissues in a concentration which would cause death.'
"In my opinion it did cause death. I have said that there was the presence of circumstances indicating the presence of poison in an amount which might have produced death, and I have also said that there was no other cause of death demonstrated. There is a possibility that there may be a cause of death which a pathological examination would not disclose, but we are usually able to determine. I did have an examination made of the contents of the stomach, but not chemically. I made no chemical examination of the stomach.
"Q. How long would it take to produce death from gas poisoning in a room in which a gas stove with one jet from one-half to three-quarters the way open, within three or four feet of the window open, window two feet wide and four feet high, with the door open from four to six inches, opening into another room and with one window in that room open, how long would one subjected to that much gas, how long would it take to produce death?
"A. There are so many conditions that would change the concentration of gas in that room that it is impossible to answer that question. I cannot give an idea.
"Q. Would it take any longer to kill a human being than it would to kill a rabbits?
"A. I have had no experience in that. *Page 249 
"I don't know the quantitative difference in the effect of carbon monoxide in any other animal and a human being. In my opinion there is a difference; it is my opinion that the rabbit will die before the human being will, but I assure you that that is just an opinion. All I have testified to is an opinion based on my observations, but in this I have made no observation.
"I said rigor mortis would set in in about one or two hours. The period of time it would take to complete it is variable, depends on what a person dies of. Under certain conditions rigor mortis occurs very rapidly and under other conditions it occurs slowly. In order to tell how long it takes to complete rigor mortis, you would have to give an exact case and exact conditions under which death occurs and I think I can answer your question. As a minimum and maximum, anywhere from one to two hours rigor mortis will set in and be fairly well developed. The time that it would be completed is variable. The period of time after death when putrefaction begins to set in depends very largely on the disease from which the person dies. In some instances disintegration of the body, assuming that the body is allowed to lie in open air, it will disintegrate within two or three hours so it could be observed. If one died of carbon monoxide poisoning, the period of time it would take putrefaction to set in would depend entirely upon the temperature of the room in which the person is lying.
"Q. Without fire, and with the temperature we have in Eastern North Carolina, what would you say?
"A. I do not know the temperature.
"Q. Assuming it is 90 degrees on May 31st?
"A. It is usually warmer in June than in May. I can't give you an accurate opinion, but I should say that anybody that lies unpreserved for four hours in the summertime would certainly begin to show evidence of disintegration. There are many evidences of disintegration; some you can see and some that would require a more experienced person to observe.
"The presence of fluid flowing from the mouth, such as is described as flowing from the mouth of Mrs. Lawson, is not evidence of disintegration; that can happen almost immediately after death. I think generally speaking one would not say that disintegration begins immediately following the stoppage of the heart beat. I think the attending physician in a thing of that sort would be able to tell."
RE-DIRECT EXAMINATION.
"Q. Your report relative to your opinion as to the cause of death, state whether or not your report does show that you give an opinion as to the cause of death?"
Defendant objects — overruled — defendant excepts. *Page 250 
EXCEPTION No. 5.
"A. Yes, sir, there is an opinion expressed there."
Defendant objects — overruled — defendant excepts.
EXCEPTION No. 6.
"In my judgment it was not necessary to make a chemical analysis of the contents of the stomach in order to determine the cause of the death of Mrs. Lawson.
"Q. Doctor, does embalming the body prevent you from ascertaining the cause of the death?
"A. No, sir, it does not, that is within limits it does not, under certain circumstances it may."
Dr. Haywood M. Taylor was presented as an expert toxicologist, and testified as follows:
"I am now employed at Duke University Hospital, Durham, N.C. I have been there since July 1, 1940. I am Assistant Professor in Biochemistry and Toxicology. (It is here admitted that Dr. Taylor is an expert toxicologist.)
"I was present at the performing of the autopsy on the body of Mrs. Lila Lawson. I observed in the performing of the autopsy; I did not participate in the actual autopsy myself. I was in the room the majority of the time. Dr. Forbus turned over certain organs and material from the body of Mrs. Lawson to me. I made an examination thereof. I examined these organs for the presence of various poisonous materials. The only positive findings that we made was the presence of carbon monoxide, formaldehyde and phenol. The formaldehyde and phenol were unquestionably present from the embalming fluid.
"The only poisonous material that was present of any significance was the carbon monoxide gas. Carbon monoxide is not normally in the body. I made a report to Mr. F. A. Garner, Coroner of Lenoir County, of my examination of the organs of Mrs. Lawson. This is my report." (Shows witness paper writing.) (Witness reads report.)
Defendant objects to the last part of it relating to the pathological findings — objection sustained.
Said report is dated July 2, 1942.
"COURT: What organs were delivered to you for examination?
"A. Portion of the brain, kidney, muscle and blood, and there was also, I think it is not noted in this report, but there was also some liver.
"I examined a portion of the brain, some of the kidney, some clots of blood, a portion of the liver. These were submitted to routine examination for poisonous materials. As I have said before I found present in those tissues some phenol or carbolic acid, formaldehyde and carbon monoxide. The phenol and formaldehyde unquestionably were present *Page 251 
due to the body having been embalmed; these are constituents of embalming fluid, but carbon monoxide is not a constituent of embalming fluid and that was found to be present in the body.
"Q. Doctor, assuming that the jury should find from the evidence beyond a reasonable doubt that Mrs. Lila Lawson was found lying on the kitchen floor of her home in Kinston at about 10 o'clock on the morning of May 31, 1942; that at the time the body was found that it had a cherry red color; that there was a gas jet partly open in the kitchen; that the body was removed from the kitchen to the undertaking establishment in the city of Kinston and there embalmed and prepared for burial and that it was buried on June 1, 1942; that on the 30th day of June, 1942, the body was removed from the grave and transported to Durham at the Duke Hospital, in which you are working, and that there an autopsy was performed thereon by Dr. Forbus in your presence and that various organs, which you have described to the jury as being examined by you, were examined by you; have you an opinion satisfactory to yourself as to the cause of the death of Mrs. Lila Lawson?"
Defendant objects — overruled — defendant excepts.
EXCEPTION No. 7.
"A. I have.
"My opinion is that she died from carbon monoxide poisoning. It is necessary to inhale carbon monoxide in order to die from it. It is absorbed through the lungs and not through the body. Only to a certain extent can I correlate the amount of carbon monoxide present in the body from the color of the body; it can be done to a certain extent. I have been in the gas plant in the City of Kinston. I know the type of gas manufactured there for cooking purposes.
"Q. Is gas made for cooking purpose heavier than air?"
Defendant objects — overruled — exception.
EXCEPTION No. 8.
"A. That is a question I cannot answer."
CROSS-EXAMINATION.
"It is possible that one might have a small amount of carbon monoxide poisoning in the tissues and that still not be the cause of death. One dying from some other cause and during the time death is ensuing and while he is still breathing if he breathes air containing carbon monoxide poison, he would still have that present in his tissues, if he breathes that in the air before he dies. Carbon monoxide is not absorbed after death, it must be absorbed before death. If a corpse is put in a space or place in which carbon monoxide is present, it would not be absorbed by the dead body. It has to be taken in through the lungs into the blood and then transported by the blood throughout the tissues. To determine *Page 252 
whether or not death was the result of carbon monoxide poison, the test ordinarily resorted to is an examination of the blood to determine the degree of saturation. One must have sufficient blood to make the determination, but there is correlation between the red color of the blood due to carbon monoxide, and in my experience with such cases people who have presented as much cherry red color as I saw in this case would indicate to me that there is an adequate amount of carbon monoxide in the system to cause death.
"Q. Your opinion is influenced by the color?
"A. Yes, in the absence of being able to make a quantitative examination.
"Q. Color itself is not always determinative of the presence of carbon monoxide poison?
"A. I know nothing else absorbed into the system that would give the color such as this.
"Q. Do I understand that the color itself is conclusive?
"A. This particular color in the skin is due to the presence of blood in the capillaries close to the surface and, after all, it is in the blood and I know of no other poison that will give this color other than carbon monoxide.
"Q. Then, you are saying that the color itself is a conclusive circumstance?
"A. I would be willing to state that it is; on the other hand, if I can go ahead and prove the presence of carbon monoxide, that is more proof.
"Q. Your opinion, in the absence of a sufficient quantity of blood to determine the degree of saturation, is based upon color and the presence of the poison in the tissues?
"A. Upon that and one other factor; the absence of any other causes of death and the presence of carbon monoxide in the tissues and the cherry red color in the skin and organs.
"Q. You say in the absence of any other cause, you refer to the pathological conclusions arrived at by Dr. Forbus?
"A. I do."
Defendant moves to strike the evidence of opinion given by this witness as above and on direct examination — motion denied, and defendant excepts.
EXCEPTION No. 9.
There was further evidence as to the content of the gas furnished the Lawson apartment by the Kinston plant and to the effect that it did contain carbon monoxide.
It is not deemed necessary to summarize other evidence in the record, since the setting of the case and the evidence pertinent to the exception upon which this decision is based may be found in the foregoing. *Page 253 
The jury found the defendant not guilty of murder in the first degree, but guilty of murder in the second degree, and from the judgment rendered upon the verdict the defendant appealed.
The theory upon which the State sought conviction was that the defendant brought about the death of the deceased through asphyxiation, or carbon monoxide poisoning, from gas issuing from a partially opened jet of the kitchen stove. When the autopsy was performed by the experts who testified for the State, the blood had been removed from the body in the embalming process, and it was admittedly impossible to make from the tissues of the body a conclusive quantitative analysis as to the degree of saturation. The necessity of establishing the cause of death by expert evidence and the important bearing of the testimony of Dr. Forbus, an expert pathologist, that he had made a post-mortem examination of the body and had found no condition which might have caused death other than the indications of carbon monoxide poisoning are apparent on perusal of the record. This leads to a serious consideration of defendant's objection to the testimony of Dr. Haywood M. Taylor, an expert toxicologist, who also gave his opinion that deceased came to her death from carbon monoxide poisoning, admittedly basing that opinion in substantial part upon the statement of Dr. Forbus that his examination disclosed no other cause of death. The objection is that this finding of Dr. Forbus had not been submitted to the witness in the hypothetical question addressed to him, and that the opinion was not predicated upon the assumption that the jury should find the evidence of Dr. Forbus to be true; and, further, that the opinion of one expert witness based upon the opinion of another is incompetent as evidence.
Dr. Forbus and Dr. Taylor had performed an autopsy and examined certain organs and tissues of the body some thirty days after it had been embalmed and interred, and both testified that the characteristic cherry red color of the tissues indicated carbon monoxide poisoning, but the finding that there was no other cause of death was peculiar to the examination and testimony of Dr. Forbus, Dr. Taylor not having made any examination or finding in that respect. The hypothetical question addressed to Dr. Taylor — which elicited his opinion as to the cause of death — made no mention of this finding or statement, directly or indirectly, or of the purported fact, or condition, thus put in evidence; and it did not transpire that Dr. Taylor had based his opinion on a state of facts not so presented to him until brought out on cross-examination. For convenience, we repeat these interrogatories and answers: *Page 254 
"Q. Your opinion, in the absence of a sufficient quantity of blood to determine the degree of saturation, is based upon color and the presence of the poison in the tissues?
"A. Upon that and one other factor; the absence of any other causes of death and the presence of carbon monoxide in the tissues and the cherry red color in the skin and organs.
"Q. You say in the absence of any other cause, you refer to the pathological conclusions arrived at by Dr. Forbus?
"A. I do."
The defendant then moved the court to strike out the testimony of Dr. Taylor — or rather, that part of it in which he gave his opinion as to the cause of death — and the motion was declined. Exception had been made previously to the admission of the evidence.
There are two avenues through which expert opinion evidence may be presented to the jury: (a) Through testimony of the witness based on his personal knowledge or observation; and (b) through testimony of the witness based on a hypothetical question addressed to him, in which the pertinent facts are assumed to be true, or rather, assumed to be so found by the jury. That an expert witness may base his opinion partly on facts of his own observation and partly on factual (as opposed to opinion) evidence of other witnesses, hypothetically presented, is, of course, within the rule.
It is clear that if in his testimony Dr. Taylor had reference to information concerning the Forbus finding obtained extrajudicially — that is, in any other manner than from the evidence given in court — the testimony is objectionable as based on a hearsay statement. If it had reference to the testimony of Dr. Forbus which immediately preceded his own, it is equally objectionable because it was not hypothetically presented — that is, was not predicated on an assumption that the jury should find the purported facts in the Forbus statement to be true.Dempster v. Fite, 203 N.C. 697, 167 S.E. 33; Summerlin v. R. R.,133 N.C. 551, 45 S.E. 898; Martin v. Hanes Co., 189 N.C. 644, 646,127 S.E. 688; Yates v. Chair Co., 211 N.C. 200, 189 S.E. 500.
Our practice and procedure does not permit an expert witness to sit in, overhear the evidence and give the jury his opinion or conclusions thereupon, without regard to what might be the attitude of the jury toward the credibility and weight of the evidence with which the witness is dealing and upon which his opinion is based. The assumption of its truth in the mind of the witness, however self-satisfying, cannot be substituted for the finding of the jury, and necessarily invades the province of the jury. It invades the province of the jury not because it gives an opinion as to the ultimate facts to be found by the jury, which is sometimes permissible, but because it permits the witness to determine for himself *Page 255 
the weight and credibility of the evidence of these facts, which ought always to be left to the jury. Even those jurisdictions which permit expert witnesses who have overheard the evidence to give an opinion upon it without a formal summation and interrogatory are strict in observing two conditions as requisite to competency: First, it must affirmatively appear that all the evidence pertinent to the inquiry has been heard by the witness; and, second, the opinion itself must be hypothetical — i.e., based on the assumption that the jury shall find the evidence upon which the opinion is based to be true. (a) State v. Medlicott, 9 Kan. 257;Kempsey v. McGinnis, 21 Mich. 123; Sebrell v. Barrows, 36 W. Va. 212,14 S.E. 996; Howland v. Oakland Consol. St. R. Co., 115 Cal. 487,47 P. 255; Williams v. State, 37 Tex.Crim. Rep., 39 S.W. 687. (b) Yardley v. Cuthbertson, 108 Pa., 395, 1 A. 765; Owings v.Dayhoff, 159 Md. 403, 151 A. 240; Scheller v. Schindel, 153 Md. 547,138 A. 415; Ingles v. People, 90 Colo. 51, 6 P.2d 455. Neither of these conditions obtained in the case under review.
In many jurisdictions — and we find the rule expressed in considered opinions — a witness is not allowed to give an opinion based on the testimony of another witness where that testimony is not incorporated in a hypothetical question. The content of the question controls the range of the answer, and thus keeps opinion evidence within its proper function. Typical of these cases, which are, of course, too numerous for exhaustive mention, we may cite and quote from the following:
In Craig v. Noblesville S.C. Gravel Road Co., 98 Ind. 109, 82 A.L.R., 1487, the rule is stated: "The only safe rule in allowing an expert witness to give an opinion, based upon the testimony of others, is to require the assumed facts, upon which an opinion is desired, to be stated hypothetically; then the jury can judge whether the assumed facts, upon which the opinion is based, have been proved, and weigh the opinion as applicable to them."
In Ditton v. Hart, 175 Ind. 181, 93 N.E. 961, the Court said: "It is settled that an expert witness will not be allowed to give his opinion upon his recollection and construction of the evidence in the case. He must base his opinion upon his own testimony or upon facts assumed to have been proven, which facts must be given to him as the foundation upon which to base his opinion."
In Guetig v. State, 66 Ind. 94, 32 Am. Rep., 99, it is said: "An expert cannot give his opinion upon evidence; it must be done upon admitted, proved or assumed facts."
In Marx v. Ontario Beach Hotel Amusement Co., 211 N.Y. 33,105 N.E. 97, we find: "An expert witness may not draw inferences or state conclusions from the testimony of other witnesses. His opinion *Page 256 
must be based on facts which are stated in the form of a hypothetical question."
In Brace v. Bath H. R. Co., 154 N.Y. Supp., 931, it appeared on the cross-examination of a medical expert that his conclusion was not based wholly on the hypothesis contained in the question propounded, but partly on the evidence given in his presence, on the trial. The Court held that it was reversible error for the trial court to refuse to strike out the answer. See, also, Ayres v. Water Comrs., 22 Hun. (N. Y.), 297.
In Richmond v. Wood, 109 Va. 75, 63 S.E. 449, the Court said: "Before the opinion of an expert, when it is based on facts which he has not himself testified to, can be admitted, he must fully understand the facts already proved, and his testimony must come in response to a hypothetical question which embodies the evidence." To the same effect is Kerr v.Lunsford, 31 W. Va. 659, 8 S.E. 493.
In Dunagan v. Appalachian Power Co., 33 F.2d 876, 68 A.L.R., 1393, the rule is thus stated: "It is well settled that in the examination of experts as to matters which they have not themselves observed, testimony as to their opinions should be based on hypothetical statements propounded in proper questions, not on the testimony of other witnesses whom they have heard testify."
See 32 C. J. S., p. 347, sec. 551.
Our own decisions adopt this view.
In Summerlin v. R. R., supra, p. 554: "There is nothing better settled than that a witness can ordinarily speak only of facts within his own knowledge, unless he is an expert, having special scientific knowledge, in which case he may give his opinion, but only upon the facts as they may be found by the jury. It is usual, therefore, to formulate what is called a hypothetical question, which should contain a recital of such facts as may have been testified to by the other witnesses."
In Dempster v. Fite, supra, p. 708, the rule as stated in N.C. Handbook (Lockhart) 2d Ed., p. 240, is adopted. (Sec. 204): "An expert may express an opinion, but he must base his opinion upon facts within his own knowledge, or upon the hypothesis of the finding by the jury of certain facts recited in the hypothetical question." This is the rule established in Martin v. Hanes Co., supra: "While a medical expert may not express an opinion as to a controverted fact, he may, upon the assumption that the jury shall find certain facts to be as recited in a hypothetical question, express his scientific opinion as to the probable effect of such facts or conditions." See Annotations, 82 A.L.R., 1468, et seq.
We think the matter is too well settled in this jurisdiction to need further citation. *Page 257 
Hitherto, for convenience of discussion, we have treated the statement of Dr. Forbus — that there were no apparent conditions other than the indications of carbon monoxide poisoning to which death might be attributed — as a simple statement of fact, but it must be regarded as more. Since it involved the application of scientific, technical and medical knowledge in examining the body and recognizing the presence or absence of pathological conditions therein upon which the statement must necessarily be based, in a field entirely beyond the knowledge of a non-expert witness, it must be classified as opinion evidence. The opinion of Dr. Taylor based thereupon is, therefore, objectionable, as it is uniformly held that the opinion of one expert based upon that of another is incompetent and inadmissible as evidence. McComas v. Wiley, 134 Md. 572, 108 A. 196;People v. Bowen, 165 Mich. 231, 130 N.W. 706; State v. King,158 S.C. 251, 155 S.E. 409. "It is generally agreed that the opinion of an expert, however qualified to speak, cannot be predicated either in whole or in part upon the opinions, inferences and conclusions of others, whether expert or lay witnesses." 20 Am. Jur., 665, sec. 791.
It is not thought necessary to advert to other objections and exceptions noted in defendant's brief.
For the error noted, the defendant is granted a new trial.
New trial.